[Civ. No. 6396. Third Appellate District.—February 19, 1940.]

MAUDE LILLIAN O'BRIEN, Appellant, v. BLANCHE C. MARKHAM, Executrix, etc., et al., Respondents.

Neblett, Warner & MacDonald, R. Dean Warner, Alfred F. MacDonald, E. Walter Guthrie and William H. Neblett for Appellant.

Harlan F. Palmer, Sparling & Teel, Jennings & Belcher and Wendell P. Hubbard for Respondents.

J. H. O'Connor, County Counsel, and Ernest Purdum, Deputy County Counsel, for Public Administrator.

PULLEN, P. J.—This is an action in equity against the beneficiaries named in the will of William F. Markham, deceased, to impress a trust in favor of plaintiff, who is seeking to have such beneficiaries declared to be involuntary trustees to the extent of a one-third interest in the estate of William F. Markham, as soon as the same is distributed to them.

The deceased executed his last will and testament on March 4, 1930. He died on April 30, 1930. The will was admitted to probate on May 22, 1930, and this action was commenced January 8, 1937.

The action is based upon the ground that the will was procured by fraud and undue influence exerted upon testator by his attorney Harlan G. Palmer. The case was tried without a jury, and at the conclusion thereof, the court held that at the time of the execution of his last will, deceased was not acting under fraud or undue influence and that the facts here relied upon were known to the plaintiff within six months of the date when the will was admitted to probate. The court further found that the plaintiff was estopped from maintaining this action because she received and retained moneys paid to her pursuant to the terms of the will, and had not, prior to bringing this action, offered to restore the same. The court further found that the plaintiff was guilty of laches, and also that her cause of action was barred by the statute of limitations. From this judgment this appeal is taken.

As grounds for such appeal it is urged that the evidence was insufficient to support the finding that at the time of the execution of his will, William F. Markham was not acting under duress, menace, fraud or undue influence, and that the essential facts were known to plaintiff within six months from the date when the will was admitted to probate; and that the court erred in its finding as to estoppel by reason of plaintiff's having received and retained certain moneys and also as to laches and the statute of limitations. From our study of this case it will not be necessary to consider these latter grounds of appeal, as we are basing our conclusions upon the first two points only, which we believe are conclusive. The record discloses that when William F. Markham executed his last will and testament he was then seventy-nine years of age, and had been suffering for some weeks prior thereto with an ailment for which he was taken to a hospital where, after observation, an operation was performed on the 29th day of April, and he died the following day.

Mr. Markham left surviving, his widow, Blanche C. Markham; a son, Leigh M. Markham, and a daughter Maude

Lillian O'Brien, the children of a prior marriage, the latter being the plaintiff and appellant herein.

The deceased left an estate which was appraised at approximately two million dollars. By his will he left the widow, Blanche C. Markham, the estate for her life, subject to bequests of $100 a month to a sister; $250 a month to Ben E. Sprague, an old friend; to his gardener Ed. Jenkins $150 a month as long as he was employed for the estate; to a niece $150 a month, and to E. S. Roe, a foreman in the factory the deceased once owned and operated in Michigan, $150 a month; also out of the estate was to be paid to the plaintiff Maude Lillian O'Brien, the daughter, $250 a month during her lifetime, and a like amount to a son, Leigh H. Markham, during his lifetime. All of the residue and accumulated income was, upon the death of the wife, to go to the four children of Harlan G. Palmer and his wife, share and share alike.

Markham at one time lived in Michigan, but in 1911 disposed of his interests there and moved to Southern California. His wife died, and in June, 1911, he married Blanche C. Markham, which marriage continued until the death of Markham. Shortly after Mr. and Mrs. Markham has established their residence in Hollywood, California, they became acquainted with Harlan G. Palmer.

Harlan G. Palmer married Ethel Hunkins in 1915, and she also became acquainted with Mr. and Mrs. Markham. Four children were born to Mr. and Mrs. Palmer. For a number of years the two families lived almost across the street from each other, and frequently visited back and forth. They often had dinners together, and as the children grew they frequently visited the Markhams and played about the yard and in the house. In 1924 the Palmers moved a few blocks away, and their visits were somewhat less frequent, and in 1926 Mr. and Mrs. Markham moved to Glendale, and from that time on their visits were only about once a month. On one occasion the Markhams spent a week end with the Palmers at their summer cabin at Malibu Lake. From about 1911 when Palmer met Mr. Markham and until the death of the latter in 1930, Mr. Palmer was Markham's personal attorney in a number of matters.

In 1928 Mr. and Mrs. Markham gave to Mr. and Mrs. Palmer the sum of $1,000, to be invested for the benefit of

the four Palmer children. In the meantime it appears that the relationship between William F. Markham and his son and daughter was not the most cordial. In 1920 Markham invited the daughter to establish her home in California, but she remained only about three months and returned to Michigan. About 1920 Leigh H. Markham, the son, came to California to make his home, but for some reason, not entirely clear, in 1926 or 1927, he returned to his former home in Michigan, and neither plaintiff nor her brother thereafter came to California, until the son returned to attend his father's funeral, and plaintiff came to California in the latter part of 1936, some time after her father's death.

In regard to the matter of the testator's intention to execute a will, we find that on January 25, 1930, Palmer received a letter written by Blanche C. Markham, at her husband's dictation. This letter stated, in effect, that for some three or four months past he and his wife had been considering the disposition of their property, and suggested that Palmer call upon them at his convenience and discuss with them the preparation of a will. Thereafter, one evening Mr. and Mrs. Palmer went to the Markham home in Glendale, where Mr. and Mrs. Markham, in the presence of Mr. and Mrs. Palmer discussed their will, and where Mr. Markham then told Mr. and Mrs. Palmer that the Markhams had decided to dispose of their property so as to take care of their friends and relations, with the remainder to the four Palmer children.

Some two or three weeks later Mr. and Mrs. Markham went to Mr. Palmer's office, where Mr. Markham delivered a written memorandum in his own handwriting, to Mr. Palmer, stating it represented the Markhams' desires in connection with the will. After some discussion of the provisions of the will Mr. and Mrs. Markham left. Thereafter Mr. Palmer called on Mr. Markham to discuss with him certain details as to whether or not Mrs. Markham should have a certain income before any of the other beneficiaries were provided for, or whether her income should come out of the remainder of the estate. On March 2, or 3, 1930, the will was finally drawn up by Mr. Palmer and mailed to Markham. Mrs. Markham testified that she first saw the original will at the Markham home about the first day of March, 1930, and it was then in her husband's possession, he hav-

ing received it through the mail. Mr. Markham read the will to her, and told her he thought he would have an attorney named Rushaupt come over and look at it. From a letter of Markham addressed to Palmer we have verification for this, inasmuch as Markham wrote that he had telephoned to a lawyer friend, Harry Rushaupt, and discussed certain provisions in the will with him.

On the 4th day of March, 1930, Mr. Markham, not having seen or corresponded with Mr. Palmer since the receipt of the will, except as just referred to, went to the office of Sarah E. Pollard, a notary public, with whom he was acquainted, and there in the presence of Miss Pollard and a Miss Johnson, and Mrs. Markham, executed the will with all of the formalities required by law. After the will was executed in Miss Pollard's office, Mr. and Mrs. Markham returned to their home, where Mr. Markham deposited the document in his safe, and it there remained until after the testator's funeral. There can be no serious attack made upon the mental or physical capacity of Markham at the time the will was executed. Letters were introduced written by Markham to his son and to his attorney both before and after the execution of the will. These letters introduced by plaintiff would appear to be the work of a clear-minded, vigorous man who knew what he wanted.

Under date of January 25, 1930, Markham wrote to Palmer as follows: ''For the past three or four months Blanche [his wife] and I have been seriously talking and thinking of the disposition of our property after we are through with it. . . . Now I am making this confession to you regarding my two children, Maude and Leigh.'' He then proceeded to give various reasons why he did not intend to leave any of his property to his two children. ''Now we are desirous of making a date with you (no hurry) and talk the matter over and draw up my will. I know now just what we want, and we wish further to get your advice whether it is better for us to turn our property over to a bank in Trust, and we would like to arrange when we do get together to have at least a good hour or more that we would not be disturbed. . . . '' This letter was not signed, but Mrs. Markham testified she wrote it at the dictation of her husband and that it was mailed either by herself or by Mr. Markham, and the lack of a signature was an oversight. Palmer tes-

tified he received the letter about the date it bore, and that he and Mrs. Palmer called upon the Markhams in response to that letter.

In a letter of March 4, 1930, addressed to Palmer, Markham refers to his health, stating he was nervous and unstrung. He stated the X-ray showed his kidneys were all right, and a blood test was O. K. He complained of a kidney trouble but said he had probably injured himself by walking too far on a recent hunting trip. He had called in a lawyer, Harry Rushaupt, he said, and asked his opinion about certain trust provisions in the will. He also discussed in this letter certain matters pertaining to his income report.

In other communications of early March, and one dated April 6th, to his son Leigh, Markham refers to his physical condition, complaining of pain at times, and that he was under treatment by a doctor for probably a kidney or bladder disorder.

Ben E. Sprague, his chauffeur, testified to facts which indicated the mental and physical condition of Markham the latter part of April, 1930.

Sprague also testified that three or four weeks prior to January 25th, Markham told Sprague he was going to give his property to Palmers' children. If given to his daughter she would, said Markham, buy a Rolls Royce, and raise hell and kill herself. If given to Leigh, he would build a church on every corner in Hollywood. "I am going to give them enough so they cannot starve. Let him work a little, I worked." "If I leave it to the Palmer children, Judge Palmer will take care of the estate, and if I let it go any other way there would not be any of them have $300.00 in five years. I want to keep it carefully and give it to somebody that will take care of it."

The historian at the hospital where the operation was performed testified as to the clear and intelligent history Markham was able to give to her. The testimony of Mrs. Markham also was to the effect that he was in good condition. There was nothing in the record upon which a finding could have been based that Markham was in such a mental or physical condition that would interfere with the execution of a valid will.

Within a very few days after the death of Markham, Maude Lillian O'Brien, appellant herein, received a copy

of the will. On May 20, 1930, less than three weeks after the death of William F. Markham, Mrs. O'Brien took up the matter of protecting her interests in the estate with Mr. Voorhies, a member of a law firm in Detroit, who entered into communication with the firm of O'Melveny, Tuller & Myers of Los Angeles, one of the outstanding law firms of California, and the matter of contesting the will and the facts surrounding its preparation and execution were considered.

On September 4, 1930, Mr. Voorhies, acting as attorney for appellant, came to California, and met with Mr. O'Melveny and Mr. Tuller, and while in California Mr. Voorhies and Mr. O'Melveny personally met Mr. Palmer and discussed with him the drafting of the will and its contents. After returning to Detroit, Mr. Voorhies advised Mrs. O'Brien that in his opinion, as was also the opinion of Mr. O'Melveny, that it would be for her best interest not to contest the will of the deceased. Through her attorneys she filed in the estate, a request for notice of proceedings as provided by section 1380 of the Code of Civil Procedure, and Mrs. O'Brien was kept informed of all steps taken in the Markham estate.

Immediately after the death of her father Mrs. O'Brien received a monthly check of $250 as provided in the will until on or about October 1, 1936, when a check in the sum of $250 which had been forwarded to her, was returned without being cashed, and no further payments from that date have been made to Mrs. O'Brien from the funds of the estate.

The foregoing represents the essential facts in the case.

Section 370 of the Probate Code, enacted in 1931, and based upon former section 1307 and the first two paragraphs of former section 1312 of the Code of Civil Procedure govern the filing of contests of wills before their admission to probate. Section 380 of the Probate Code, enacted in 1931, is based upon former section 1327 of the Code of Civil Procedure, and governs contests after the will is admitted to probate.

In *Tracy* v. *Muir*, 151 Cal. 363 [90 Pac. 832, 121 Am. St. Rep. 117], the court, in considering the effect of offering a will for probate, points out that the proponents thereby tender to the world the issue as to its genuineness, and unless one has been prevented from so appearing and contesting, by

some fraud of those procuring the probate, he must be concluded by the decree as to any matter concerning which he could have obtained relief by a contest. It is no excuse for his failure to appear to claim, that he did not know the alleged will was not genuine, that being one of the issues tendered by the sponsor of the will.

■ Many authorities establish the rule to be that if no contest is filed to a will before its admission to probate, or within the statutory time thereafter, the order admitting the will to probate becomes and remains *res judicata* and is impervious to any assault and the will cannot be set aside. (*In re Maxwell,* 74 Cal. 384 [16 Pac. 206]; *Estate of Smith,* 214 Cal. 50 [3 Pac. (2d) 921]; *Estate of Bloom,* 213 Cal. 575 [2 Pac. (2d) 753].)

■ This rule is admitted by appellant but she bases her cause of action upon the principle that even though a will has been admitted to probate and the time to contest has expired, nevertheless, an interested party, who has by active extrinsic fraud been prevented from contesting the will, may seek the aid of equity, not to set aside the will, nor the order admitting it to probate, but to have the beneficiary under the will declared a trustee for the person so injured by the extrinsic fraud. This rule is clearly laid down in *Caldwell* v. *Taylor,* 218 Cal. 471 [23 Pac. (2d) 758, 88 A. L. R. 1194]. ■ As there announced the plaintiff must first prove that by extrinsic fraud she was prevented from contesting her father's will. If she can do so, *then* as the court said, she is entitled to consideration of her claim that the will was procured by undue influence. It would therefore appear that the burden was first upon plaintiff to establish that by such extrinsic fraud she was prevented from contesting the will within the statutory time, and if successful in that, she may then offer proof pertaining to the question of the validity of the will. Putting it more succinctly we quote from *Caldwell* v. *Taylor, supra*:

"We are, therefore, of the opinion that if plaintiff upon a trial of this issue is able to prove that in fact by such fraud he was prevented from adequately and fully presenting his contest of his father's will, *then* he is entitled to a consideration by the court of the question of whether or not the will was in fact procured by the fraud of the beneficiary as alleged in his complaint, which question has been heretofore

foreclosed to him by the order admitting the will to probate.'' (Emphasis added.)

█ The appellant did not present these two elements separately, and the trial court permitted her to introduce her entire case and then ruled upon the whole matter treating the authenticity of the will and the question of extrinsic fraud together.

Analyzing, however, the two elements separately and in the order prescribed by *Caldwell* v. *Taylor, supra,* we find that appellant presents the following as facts which she claims prevented her from learning of the undue influence until after the contest period had expired. First, she claims that she was ill most of the time for the nine months before her father's death, and was ill for over two years after he died, and was confined to her home in Detroit, Michigan. She next points out that she retained a lawyer and in October, 1930, directed that he come to California to investigate the possibilities of a successful contest of the will, and that upon his return from California this attorney advised her it would be for her best interest not to bring a contest of the will. She next states that her attorney reported to her that he had a conversation with Mr. Palmer wherein Mr. Palmer told him that her father was in ''pretty good health'' and that he had things just as he wanted it, and that he also reported to her that her father was in good physical condition on March 4th, the date of the execution of the will. She also stated that her attorney told her that Mr. Palmer had told him that Mr. Markham drafted this will, and that the will was in his own handwriting.

We do not find in the testimony of Mr. Voorhies that he told appellant that Palmer told him that Markham drafted the will. That is merely what appellant says that Voorhies told her. Mr. O'Melveny, who was present at all of the meetings between Voorhies and Palmer, testified positively that Palmer told Mr. Voorhies and himself that he, Palmer had, himself, drafted the will from a memorandum in Markham's handwriting.

Mr. O'Melveny testified that Mr. Palmer had told Mr. Voorhies and himself that he (Palmer) had drawn the will, but that it had been prepared from a written memorandum in Mr. Markham's handwriting directing how Palmer should draw the will. This written memorandum was not asked

for, but at that time appellant learned of its existence, which was some time before the expiration of the time for the contest of the will. We need cite no authorities here to the point that what her attorneys knew appellant knew. (*Bierce* v. *Red Bluff Hotel Co.,* 31 Cal. 161; *Nelson* v. *Nelson,* 131 Cal. App. 126 [20 Pac. (2d) 995].)

It is to be noted that appellant conceded that Mr. Palmer said Mr. Markham was in "pretty good health". Appellant knew, at least immediately after the death of her father, that he died in a hospital and had been there for about a week prior to his death. She also knew from what Mr. Palmer told her attorneys that he was Mr. Markham's personal attorney.

Inasmuch as appellant abandoned any claim of incompetency of the testator to execute a will, the questions as to his health are not material. There was ample evidence in the hands of the attorneys for appellant, however, in the form of communications between Markham and his son in regard to the health and physical condition of the father. There was ample independent evidence that Mr. Markham was an active and vigorous man, and that his ailment for which he was operated upon, and from the shock of which he subsequently died, had no effect whatever upon his mental condition or his capacity to execute a valid will. It is to be remembered that about a month before the will was executed Markham had gone on a hunting trip, walking, as he himself said, about twenty miles.

Do the foregoing facts suggest fraud? Appellant received a telegram the following day telling her of the death of her father, and subsequently a letter from the widow describing the funeral. Under date of April 9th, is a letter from Mrs. Markham to appellant to which is added a postscript, "Your father is much better". In a letter of May 5th, from Mrs. Markham to appellant, telling her of the last days of Mr. Markham, the letter states: "He told Judge Palmer the night before that he had everything arranged just as he wanted it and he was not afraid." Also, within five days after the death of Markham, appellant received a carbon copy of the will. She also received notice of the offering of the will for probate. Mr. Leigh Markham came to California from Michigan and attended the funeral of his father. Before returning to Detroit he discussed the provisions of the will with Palmer and was advised by him

to consult an attorney, which he did, calling upon Mr. Nathan Newby, Jr., an able and experienced lawyer, with whom he discussed the will upon several occasions. After his return to Michigan he had an interview with Mr. Voorhies, the attorney for appellant, in the presence of Mr. Voorhies, Mrs. O'Brien, the appellant, her husband, Leigh Markham and his wife. Subsequently he had other conversations with Mr. Voorhies, at some of which his sister was present. He also gave Mr. Voorhies at that time four letters or telegrams written in March, 1930, pertaining to the health of Markham.

Mr. Voorhies spent the greater part of a week in Los Angeles investigating the facts surrounding the Markham will some time about the 20th of October, 1930. He saw Mr. Palmer and had at least one discussion with him in the presence of Mr. O'Melveny. Mr. Palmer stated he had been the personal attorney for Mr. Markham, but had not been a party in any way to what Mr. Markham wanted. He also said Mr. Markham's physical condition was not exactly normal but he was in apparent good health and sound mentally.

Mr. O'Melveny testified that Palmer said that at the time the will was executed Markham was not entirely well physically but was of sound mind and disposing memory; that Palmer stated he had drawn the will himself but that it had been drawn from a written memorandum in Mr. Markham's handwriting, directing Palmer how he should draw the will so as to comport with Mr. Markham's desires. The written memorandum was not asked for nor produced. Palmer also said he had been Markham's personal attorney for many years.

Appellant claims that certain material facts were kept from her. She knew, however, that her father was over seventy-nine years of age. She knew almost immediately that he died in a hospital. She received a copy of the will before it was admitted to probate, and from its face it appeared it was executed less than two months before his death, and that the Palmer children were the residuary legatees.

She also, through her attorneys, knew that Palmer was the draftsman of the will, prepared from a memorandum given him by her father, and that he had long been the attorney and personal friend of Markham, and from Palmer they

knew her father, at the time of the execution of the will, "was not entirely well physically".

We fail to find any indication of extrinsic fraud in the statement or conduct of Palmer toward appellant. It is evident that before the expiration of the contest period the plaintiff either had actual knowledge of matters upon which her claim of undue influence is based, or implied knowledge of them through her attorneys. ■ The trial court so found, and as has often been said every intendment is in favor of the finding as made by the trial court, and it will not be set aside unless it is plain to a reviewing court that the conclusion cannot be supported on any rational view of the testimony. (*Lewis* v. *Lewis,* 167 Cal. 732 [141 Pac. 367, 52 L. R. A. (N. S.) 675].) The testimony here fully supports the finding of the court.

■ It was next suggested that Mr. and Mrs. Palmer failed to remember certain details while testifying at the trial, and that there was a lack of affection and interest between Markham and the Palmer children. Neither one of these arguments can have any bearing upon the issue as to whether or not plaintiff was prevented from discovering facts sufficient to institute a will contest within the statutory period. We might, however, refer to the fact of the early acquaintance with the Palmer children, and that the Markhams gave to these children the sum of $1,000 a few years before the death of Mr. Markham, and that a short time before he executed his will he told Sprague that the Palmer children should not be disturbed in their play at the Markham home because the place would some time belong to them. On March 4, 1930, Markham wrote to Palmer:

"Now, Pard, you and I must pull together because we have got four blessed children to consider and we take as much pleasure in thinking of their future as we do our present time."

Everything in the record bears out the finding of the trial court that Palmer did nothing to conceal or to misrepresent his activities or relationship in regard to the execution of the will. However, appellant, shortly after she received a copy of the will became sufficiently suspicious to engage an attorney and send him from Detroit to California to personally investigate the possibilities of a contest, and this attorney, in conjunction with one of the most reliable firms of

lawyers in California, after investigation, and in at least two conferences with Palmer, found nothing to justify a contest. In fact we find no allegations in the complaint that Palmer or Mrs. Markham made any false or fraudulent representations to Markham while in his asserted weakened condition, or at any other time.

The question of estoppel by virtue of plaintiff having failed to restore certain moneys paid to her out of the funds of the estate, and the plea of the statute of limitations, we do not consider as we believe that what we have stated is sufficient to justify the conclusion of the trial court.

An examination of the entire record convinces us that plaintiff has failed to establish a case in equity, and that the judgment of the trial court should be affirmed, and it is so ordered.

Thompson, J., and Tuttle, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 18, 1940.